703 P.2d 1240

**William Warren PINCOCK, Personal Representative of the Estate of Vukosava Milana Bell, Deceased, Plaintiff/Appellant,**

v.

**Pima County Sheriff Clarence DUPNIK; and Fred William Bair, Defendants/Appellees.**

**No. 2 CA–CIV 5244.**

Court of Appeals of Arizona, Division 2, Department A.

May 20, 1985.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by D. Michael Mandig, Tucson, for plaintiff/appellant.

Murphy, Clausen & Goering, P.C. by David L. Berkman, Tucson, for defendants/appellees.

## OPINION

HOWARD, Judge.

The issue in this wrongful death action is whether the trial court erred in prohibiting

appellant's expert witness from testifying. We conclude that it did and we reverse.

On June 21, 1980, Deputy Bair of the Pima County Sheriff's Department was driving his patrol unit on Pontatoc Road just north of River Road in Tucson when a vehicle being driven by Alex Barela came across the center line, started to fishtail and would have struck the patrol unit had Deputy Bair not taken evasive action.

Deputy Bair made a U-turn and pursued Barela. Deputy Bair suspected Barela of driving while under the influence of alcohol. Near Dodge Boulevard and River Road Barela pulled off onto the shoulder. However, while Deputy Bair was advising the dispatcher of the stop, Barela accelerated and began moving quickly south on Dodge. Bair pursued Barela. A high-speed chase ensued. Barela traveled south on Dodge which had a 35-mile-per-hour speed limit, at speeds ranging from 60 to 100 miles per hour. Unfortunately, at the intersection of Dodge and Glenn Street, Barela struck the vehicle being driven by Vukosava Milana Bell, killing her.

The personal representative filed this case against the sheriff, Deputy Bair and the 18-year-old Barela. The action was tried to a jury which returned a verdict in favor of the plaintiff and against Barela in the sums of $500,000 compensatory damages and $3,000 punitive damages. However, the jury returned a verdict in favor of the defendants Dupnik and Bair and against the plaintiff.

At the time of this accident the sheriff's department had a manual which determined the procedures to be employed by its deputies relative to high-speed chases. It provided:

"Deputies are expected to discontinue a pursuit when a reasonable law enforcement officer may conclude that continuing the pursuit could pose a serious risk to life or property and that [sic] risk outweighs the value of apprehending the suspect."

George Kirkham testified on behalf of the defendants in relation to this issue. He held bachelor's and master's degrees in the field of criminology from California State University at San Jose and a doctorate in criminology from the University of California. Over the years he had on many occasions examined police conduct in the area of high-speed pursuit. He had been involved in over 100 cases that centered on questions of vehicular pursuit.

Dr. Kirkham had trained the entire Tallahassee Police Department regarding the elements to be considered in the initiation and continuance of vehicle pursuit and had conducted seminars in various locations on vehicular pursuit and on the factors that should be considered in the continuance of such pursuits. He taught the officers to consider a number of things such as the time of day, the traffic density of the motorists in the immediate area, the character of the area, the type of road, and the use of flashing red lights and siren.

The film that Dr. Kirkham produced had been used quite extensively throughout the United States to train police officers. Dr. Kirkham, over the past ten years, had also been involved in emergency vehicle pursuits as an officer either as a driver or as a passenger.

Dr. Kirkham testified:

"But this type of pursuit, in [sic] the character of the road, the time, the absence of traffic control devices, lights involved, the absence of other vehicles in peril, all this happening in about a minute, I think that that [sic] within the limits of what human beings could do in this very stressful kind of situation, I think the officer was reasonable and tried to stop this person who he already knew was someone who should be gotten off the road, if it could be done safely without injuring other people. You know, he knew that this person was— someone who was driving over the center line and needed to be stopped, and I think—I think this conduct was reasonable and fair. Yes, I do."

Plaintiff sought to call as an expert witness Dr. Leonard Territo, a professor of criminal justice. Dr. Territo would have expressed the opinion that Deputy Bair acted unreasonably in continuing to chase Barela once the speed of the pursuit hit 55 to 60 miles per hour. He based his opinion on the fact that Deputy Bair was chasing only a traffic violator and the fact that the area of Dodge Boulevard between Glenn Street and River Road was a residential area.

The foundational predicate for Dr. Territo's testimony was as follows: Dr. Territo was a professor of criminal justice at the University of South Florida at Tampa from 1974 through 1977 and from June 1979 to the date of the trial. He had instructed at St. Petersburg Junior College in the department of police administration and police operations from 1968 through 1970. He was promoted in 1971 to deputy chairman and was simultaneously the director of the Florida Institute of Law Enforcement responsible for continuing education of police officers.

From 1964 to the date of the trial, Dr. Territo has taught at police academies at both the recruit and middle management levels. He has instructed police officers in virtually all facets of law enforcement, including patrol techniques and emergency response procedures. In 1967 and 1968 as a Tampa police officer, and from 1968 to 1974 as an instructor at St. Petersburg College, Dr. Territo taught police operations, which included instruction on how a vehicular patrol officer should handle emergency responses, including the factors the officer should take into consideration in responding to emergency traffic situations. Emergency, or "Code 3" responses, are procedures which require a police officer to use lights and siren and authorize an officer to exceed the posted speed limit. For six years, Dr. Territo instructed officers as to what to do and what not to do while driving a patrol vehicle. Additionally, during the last four years prior to trial, Dr. Territo taught courses at the police academy designed to instruct officers on how to deal with job stress, including instruction concerning how to handle emergency driving situations.

Dr. Territo started with the Tampa Police Department patrol bureau in 1959, where he remained for thirteen months. He was then transferred to the traffic bureau, where he was a motorcycle officer and accident investigator for twenty months. Thereafter, for approximately the next five years, he was a detective assigned to the detective bureau, after which he was assigned to Tampa's police academy training staff, where he taught homicide investigation and patrol techniques.

In January 1977, Dr. Territo took the position of major with the Leon County Sheriff's Department in Florida. His responsibilities included the jail, records, communications, personnel, training, etc. In October 1977 he was promoted to chief deputy and all divisions within the sheriff's department came under his responsibility, including the patrol and detective bureaus.

During Dr. Territo's tenure as a major in the Leon County Sheriff's Department, he was a member of an accident review board which evaluated traffic accidents involving departmental personnel or vehicles, including accidents arising out of high speed pursuits. The accident review board generally evaluated all circumstances of an accident to determine if there was any culpability on the part of the deputy. Dr. Territo was employed with Leon County through June 1979, when he returned to the University of South Florida as a professor of criminal justice.

Dr. Territo had been involved in a half dozen high-speed pursuits, two on motorcycles and four in automobiles. The last high-speed pursuit in which he was involved was in 1978 as chief deputy in the Leon County Sheriff's Department.

In 1981, Dr. Territo conducted a study to evaluate high-speed pursuit policies of po-

lice departments across the country. He sent out 144 questionnaires to major police departments across the nation and received 45 responses. He analyzed and compiled the best of the responses to formulate an ideal policy for police instructors and administrators regarding the factors an officer should consider in high-speed pursuits and emergency responses. His article, entitled "Citizen Safety: Key Element in Police Pursuit Policy", was published in *Trial Magazine, Florida Police Chief Magazine* and *Campus Law Enforcement Journal.* At the time of the trial, the contents of the article were under consideration by the International Association of Chiefs of Police as a training key.

The trial court sustained the defendants' motion to prohibit Dr. Territo from testifying on the ground that while Dr. Territo might be an expert on office policies he did not show any grounds for expertise on the subject of whether or not Deputy Bair acted reasonably under the circumstances. In other words, if the adequacy of Pima County's policy or manual concerning pursuit were at issue, Dr. Territo would be competent, but he was not competent to testify on the reasonableness of Deputy Bair's driving because he had never taught any courses in high-speed driving or defensive driving and had never conducted any training of officers in regard to high-speed pursuits.

The trial judge pointed out that Dr. Territo had merely run a study regarding different police and sheriff's departments and what policies they formulated. She reasoned:

"... But, I don't think that the Ph.D. student would be qualified to evaluate whether a particular doctor meets the standard of care for the community in performing open heart surgery, and that's what you have."

It is blatantly obvious that that is not what plaintiff had here and that the trial judge erred in refusing to allow Dr. Territo to testify while allowing Dr. Kirkham to testify.

Rule 702, Rules of Evidence, 17A A.R.S. provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Whether a witness is competent to testify as an expert is a matter primarily for the trial court and one largely within his discretion. *State v. Seebold,* 111 Ariz. 423, 531 P.2d 1130 (1975). As far as the expert's qualifications are concerned:

"... All that is necessary is that the potential witness have information from experience, training or education that would be helpful to the present trier. Furthermore, it is not required that the witness 'have the best possible qualifications, nor the highest degree of skill or knowledge,' so long as he does have 'skill and knowledge superior to that of men in general.' ..." 1 M. Udall and J. Livermore, Arizona Practice: Law of Evidence § 22 (2d ed. 1982) at 31.

While the determination of whether an expert witness is qualified to testify is normally within the discretion of the trial court, that determination is reversible if it is a clear abuse of discretion. *Wood v. Stihl, Inc.,* 705 F.2d 1101 (9th Cir.1983); *Garrett v. Desa Industries, Inc.,* 705 F.2d 721 (4th Cir.1983). Here, Dr. Territo had taught courses on emergency driving, had himself as a police officer engaged in pursuit driving, and had been a member of an accident review board which, among other things, investigated accidents arising out of high-speed pursuit. Furthermore, the article that he had written, which reviewed the policies of various police departments across the country concerning high-speed pursuits, contained factors that the officers should consider in responding to emergency calls and high-speed pursuits. In view of the fact that the trial court let the

defendant introduce expert testimony on the issue, it was blatantly erroneous for the trial court to exclude the testimony of Dr. Territo.

As we are reversing this case and remanding for new trial, we find it necessary to comment on whether the testimony of either Dr. Territo or Dr. Kirkham as to whether Officer Bair acted reasonably was a proper subject of expert testimony.

M. Udall and J. Livermore, supra, § 22 at 28, states:

"In a day when expert testimony has become pervasive, it is well to remember the true basis on which it is admitted. It is not, as some current practice suggests, a mechanism for having someone of elevated education or station engage in a laying on of hands, placing an imprimatur, upon the justice of one's cause. Rather it is a device allowing the trier to receive information, *beyond its competence*, useful to the resolution of the dispute before it. * * * Experts are not, in theory, called to tell the jury who should win. They are called, instead, to provide knowledge to the jury to permit the jury rationally to decide the case before it." (Emphasis added)

The authors recognized that under Rule 704 of the rules of evidence expert opinion evidence is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, but as the authors observed:

"But there was a kernel of sense in the older rule. As one approaches the ultimate issues in the case, the trial judge should exercise his discretion with great care to insure that the proposed testimony truly relates to an area of specialized knowledge and that the witness is truly qualified to provide assistance to the trier. This is the burden of the Arizona Committee comment to Rule 704:

'Some opinions on ultimate issues will be rejected as failing to meet the requirement that they assist the trier of fact to understand the evidence or

to determine a fact in issue. Witnesses are not permitted as experts on how juries should decide cases.'" M. Udall and J. Livermore, supra, § 26 at 46.

We believe that it is within the knowledge of the average juror that a high-speed chase poses more danger to both the participants and innocent bystanders when traffic is heavy, when weather conditions are poor, when it is night, when there is a great deal of pedestrian traffic, when the driver is unfamiliar with the area, when the drivers have less experience in high-speed pursuits, when the pursuit takes place in a residential, school, or business area, and when the driver of the pursued vehicle is under the influence of alcohol. We also believe that it is within the knowledge and experience of the jurors that engaging a bank robber in a high-speed pursuit may be more reasonable than chasing, at high speeds, a person who has failed to come to a complete stop at a stop sign. In short, we do not believe that the opinions of Drs. Territo and Kirkham as to whether or not Officer Bair acted reasonably would be of any assistance to the trier of fact since no special knowledge is required. See *Shaner v. Tucson Airport Authority, Inc.*, 117 Ariz. 444, 573 P.2d 518 (App.1977). This does not mean that these experts cannot testify as to other matters where expert testimony would be helpful to the jury.

Reversed and remanded for further proceedings.

BIRDSALL, P.J., and FERNANDEZ, J., concur.