ECKERSTROM, Chief Judge,
specially concurring.
¶ 35 Although I fully agree with my colleagues’ wellreasoned opinion in every other respect, I cannot agree that the trial court properly precluded the testimony of the defendant’s expert witness. In essence, the trial court ruled that an undisputed expert in the scientific field of experimental design was unqualified to testify about the experimental design of toolmark comparison testing. Given that the state claimed at trial that the toolmark comparison evidence demonstrated a match to “a reasonable degree of scientific certainty,” Dr. Haber’s proposed testimony was relevant and probative to Romero’s defense. Because the majority has apparently overlooked the limited scope and nature of Haber’s proffered testimony, it affirms the trial court’s erroneous preclusion of that testimony.
¶ 36 I write separately at length because, in supporting that ruling, the majority applies an elevated standard for the admission of expert testimony at odds with both Rule 702 and controlling jurisprudence interpreting that rule. Our supreme court has held: (1) the presentation of general expert testimony is admissible to the extent it is relevant, reliable, and helpful to the jury, State v. Salazar-Mercado, 234 Ariz. 590, ¶¶ 9-11, 325 P.3d 996, 999 (2014); (2) a trial court’s pretrial conclusion that a purported scientific practice is reliable is not binding on the jury, and it invades the province of the jury for a court to preclude otherwise admissible evidence challenging such reliability, State v. Lehr, 201 Ariz. 509, ¶¶ 26-29, 38 P.3d 1172, 1180 (2002); and (3) the comparatively relaxed standards for the admission of expert testimony under Rule 702 are not the elevated ones set forth, for example, under the common law in the area of medical malpractice, Seisinger v. Siebel, 220 Ariz. 85, ¶¶ 32-35, 203 P.3d 483, 492-93 (2009), or those implicitly set forth by the Eleventh Circuit in United States v. Paul, 175 F.3d 906 (11th Cir.1999). To the contrary, Rule 702 does not require an expert to have qualifications or expertise parallel to those of the opposing party’s expert. See Ariz. R. Evid. 702 (expert may be qualified by “knowledge, skill, experience, training, or education” to help jury understand evidence). Rather, experts need only possess wisdom, derived from any of these sources, superior to that of the jury on the topic of their testimony. Pincock v. Dupnik, 146 Ariz. 91, 95, 703 P.2d 1240, 1244 (App. 1985).
¶ 37 In contradiction of this controlling authority, the majority reasons expressly or implicitly that: (1) Dr. Haber’s expertise and opinions are too general to be admissible to counter the specific conclusions of the state’s firearms identification expert, (2) Haber’s experiential qualifications must match or approximate those of the state’s expert, (3) a trial court may require an expert to possess experiential qualifications even though Rule 702 sets forth no such prerequisite and even though the expert’s topic of testimony would demand no such experience, and (4) an expert in experimental design, who has reviewed all of the studies and literature in the field of toolmark identification, provides a jury with no assistance in understanding the limitations, from the standpoint of experimental design, of the toolmark evidence before it. Finally, the majority leaves undisturbed — and unaddressed — the trial court’s erroneous ruling that Haber’s testimony was inadmissible because the court had disposi-tively resolved the reliability of toolmark identification evidence during the Daubert hearing, and that ruling therefore could not be relitigated before the jury.
¶ 38 As a threshold matter, any assessment of an expert’s qualifications must be anchored in the scope of the expert’s proffered testimony. See Gaston v. Hunter, 121 Ariz. 33, 51, 588 P.2d 326, 344 (App.1978) *462 (expert must be competent to give expert opinion on issue about which he is asked to testify). Here, both the trial court and the majority are correct that Dr. Haber has never been certified to conduct a toolmark comparison test and has never done so himself. However, Romero did not offer Haber to critique Powell’s execution of that test but rather for a more general task: to question the scientific method underlying such tests, when they have been conducted in accordance with the current standards of the field.
¶39 In presenting his opinions on that point at the Daubert hearing, Haber articulated the general features of conventional toolmark comparison testing that, in his view, fell short of scientific standards for experimental design. He further testified that those failings limited the scientific weight that could be placed on the results of any such test. As Romero’s counsel clarified, Haber was not offered to comment on the facts of the case or to opine whether Powell was ultimately “right or wrong.” Although Haber testified that he was completely familiar with the extensive literature and studies in the field of toolmark analysis and the protocols for such testing, Romero did not contend that Haber was qualified to challenge whether Powell correctly performed the test of the weapon in accordance with the standards of that field. Instead, Haber opined that those tests, even if conducted correctly, could not scientifically justify the conclusions that the state sought to draw.
¶40 Therefore, our task is not to assess whether Dr. Haber had the qualifications to opine about the mechanics of conducting a toolmark comparison but rather whether he was qualified to testify as to the general scientific limitations of the field. Our supreme court has recently held that Rule 702, Ariz. R. Evid., allows an expert to offer “general, educative testimony to help the trier of fact understand evidence or resolve fact issues.” Salazar-Mercado, 234 Ariz. 590, ¶ 6, 325 P.3d at 998. The court explained that nothing in Rule 702 “ ‘alter[s] the venerable practice’ of permitting experts ‘to educate the factfinder about general principles.’ ” Salazar-Mercado, 234 Ariz. 590, ¶ 9, 325 P.3d at 999, quoting Fed.R.Evid. 702 advisory committee notes, 2000 amends.
¶41 Nor are the standards set forth in Rule 702 for the presentation of such testimony either strict or technical. General testimony is admissible if “ ‘(1) the expert [is] qualified; (2) the testimony address[es] a subject matter on which the factfinder can be assisted by an expert; (3) the testimony [is] reliable; and (4) the testimony “fit[s]” the facts of the ease.’” Salazar-Mercado, 234 Ariz. 590, ¶ 10, 325 P.3d at 999, quoting Fed.R.Evid. 702 advisory committee notes, 2000 amends, (alterations in Salazar-Mercado). The “‘fit’ pertains to Rule 702(a)’s ‘helpfulness’ standard.” Salazar-Mercado, 234 Ariz. 590, n. 1, 325 P.3d at 999 n. 1.
¶42 Helpfulness is determined by “‘the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.’” Fed. R.Evid. 702, advisory committee notes, 1972 proposed rules, quoting Ladd, Expert Testimony, 5 Vand. L.Rev. 414, 418 (1952). The requirement that evidence be helpful to assist the jury is “ ‘satisfied where expert testimony advances the trier of fact’s understanding to any degree.’” United States v. Archuleta, 737 F.3d 1287, 1297 (10th Cir. 2013), quoting 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265, at 250 (1997). Helpfulness is therefore similar to relevance, and it is a low threshold to clear. E.E.O.C. v. Boh Bros. Constr. Co., 731 F.3d 444, 459 n. 14 (5th Cir.2013) (en banc).
¶ 43 In the context of the case before us, Dr. Haber’s proffered testimony far exceeded this modest standard. Because the state lacked any eyewitness evidence that Romero was involved in the homicide, its case depended on demonstrating Romero’s connection to items found or identified at the crime scene. Before trial, the state conducted a toolmark analysis on a .40 caliber Glock handgun found in Romero’s vicinity a month after the shooting. The state’s toolmark expert opined that, based on a visual comparison he had conducted of the spent cartridges *463 found at the murder scene with those ejected by the Glock handgun during testing, the cartridges at the scene could have been fired only by that handgun. At trial, the state elicited, and the state’s expert maintained, that such matches reflected “a reasonable degree of scientific certainty.”
¶ 44 The defense presented Dr. Haber to challenge the validity of this scientific claim. In essence, the defense offered Haber to testify that: (1) the general thesis that each handgun leaves a unique signature of discernible markings on both cartridges and bullets has not yet been scientifically demonstrated; [8] (2) that no standards have been developed for determining which types of “tool marks” on a cartridge or bullet are relevant to conducting the visual comparison, nor have any standards been developed for determining how many similarities in markings are necessary to conclude that a cartridge or bullet had been fired by a particular weapon; (3) that not enough is scientifically documented about the similarities or differences between the tool marks left by individual guns; and (4) therefore, isolated toolmark comparisons cannot yet confidently determine by scientific standards whether a certain visual similarity in bullets and cartridges demonstrates a match — or merely reflects similarities of make (class) or production batch (subclass).
¶45 In short, the state’s contention that the fatal bullets could only have been fired from a gun later found near Romero was significant to its case. Dr. Haber’s testimony would have been relevant and therefore helpful to the jury in determining how much weight to give the testing evidence marshaled by the state’s expert in support of that claim. Notably, neither the state nor the trial court appeared to question the relevance of Haber’s proposed testimony. Indeed, the court allowed defense counsel to develop the same critique of the toolmark identification evidence during cross-examination of the state’s expert during trial.
¶ 46 Thus, while there is little dispute that the topic of Dr. Haber’s testimony would have been relevant and helpful to the jury, the trial court ultimately precluded his testimony on the ground he lacked adequate qualifications to so testify. In determining whether a witness is adequately qualified to testify, we must be mindful that “ ‘it is not required that the witness have the best possible qualifications, nor the highest degree of skill or knowledge, so long as [the witness] does have skill and knowledge superior to that of [persons] in general.’ ” Pincock, 146 Ariz. at 95, 703 P.2d at 1244, quoting 1 Morris K. Udall & Joseph M. Livermore, Arizona Practice: Law of Evidence § 22, at 31 (2d ed.1982). A proposed expert witness need not “ ‘satisfy an overly narrow test of his own qualifications’ ” and is not required to have certificates of training or membership in a professional organization. United States v. Barker, 553 F.2d 1013, 1024 (6th Cir.1977), quoting Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir.1974).
¶47 Moreover, an expert’s qualifications need not mirror or parallel those of the expert whose opinions he or she may challenge. To the contrary, Rule 702 contemplates the admissibility of conflicting expert testimony “based on competing methodologies.” Ariz. R. Evid. 702 cmt. For this reason, the state’s contention that Dr. Haber lacked the qualifications to assist the jury in evaluating the reliability of toolmark analysis, simply because he was not a practitioner of the methodology used by the state’s expert, finds little support in Rule 702 or our jurisprudence interpreting that rule.[9]
*464 ¶48 Notably, the state’s toolmark expert, Prank Powell, lacked the education, training, and experience to address Dr. Haber’s fields of expertise — statistical analysis and experimental design. Yet, both Powell and Haber, one qualified primarily by experience and practice and the other primarily by education and study, were able to provide information “helpful” and relevant to the jury in resolving the question before it.
¶ 49 Indeed, the record demonstrates that Dr. Haber had acquired ample education, training, and experience to evaluate, from the standpoint of scientific method, whether particular experiments produce scientifically valid conclusions. He testified that he has a Ph.D. in experimental psychology from Stanford University, which originally trained him to teach experimental design. He taught experimental design for six years at Yale University and thereafter for fifteen years at the University of Illinois and the University of Rochester.
¶50 Notwithstanding the majority’s suggestion that he has rarely applied his expertise in scientific design outside the field of psychology, he has been trusted by twenty different academic journals to conduct peer review of articles in a variety of scientific fields as to “experimental designs” and “the interpretations and the statistical methods” used to support “the conclusions reached.” Organizations that have sought Dr. Haber’s expertise in experimental design include the National Science Foundation and the National Institute of Health. Since 1994, for two decades, Haber has applied that expertise to research conducted in the field of the forensic sciences. He has testified numerous times in the area of fingerprint comparisons. He has been asked to analyze grant applications for the study of forensic sciences by the National Institute of Justice (NIJ), the research arm of the U.S. Department of Justice. Specifically, the NIJ has asked him to analyze the merits of a grant application for research of handgun identification.
¶ 51 He testified that he is “thoroughly familiar” with the literature in the field of handgun identification through toolmark identification and has written a paper, published in the California Bar Journal, on the topic. He likewise testified that he is thoroughly familiar with both the methodology and studies in the field of firearms identification, including the publications of the NIJ that provide guidelines and the most current research. Thus, while Dr. Haber is no practitioner of the discipline of toolmark comparisons, he is sufficiently learned in its methodologies and protocols to usefully apply his undoubted expertise in experimental design to that field.[10]
¶ 52 In short, Dr. Haber possesses knowledge, education, and experience far beyond that of the layperson for analyzing which scientific or statistical conclusions may be drawn from a particular experimental methodology and which may not. Indeed, he has been trusted by numerous scientific journals and our nation’s most prestigious scientific foundations to do precisely that in a wide variety of fields. And, he has applied that knowledge for many years to evaluating various forensic techniques.
¶ 53 The majority’s suggestion that Dr. Haber is little more than a psychologist dabbling in a field otherwise alien to him cannot be reconciled with the record before us. And, when viewed in light of the correct legal standard set forth in Rule 702, which sets a *465 modest threshold, the record simply does not support the trial court’s conclusion that Haber was unqualified to offer general opinions on the scientific reliability of toolmark comparisons based on his understanding — which is comprehensive — of the experimental design of that methodology.[11] See Villalpando v. Reagan, 211 Ariz. 305, ¶ 6, 121 P.3d 172, 174 (App.2005) (abuse of discretion occurs when record does not substantially support trial court’s decision); see also State v. Chapple, 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983) (trial court abuses discretion in precluding expert when reasons given for ruling are clearly untenable or unsupported by record). In this context, any arguable deficits in Haber’s skill or training would go to the weight of his testimony rather than its admissibility-a result Rule 702 specifically contemplates. See Ariz. R. Evid. 702 cmt. (“The trial court’s gatekeeping function is not intended to replace the adversary system. Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.”).
¶ 54 Notwithstanding the above record of Dr. Haber’s affirmative qualifications, the majority asserts in essence that Haber’s general expertise in experimental design does not qualify him to analyze the specific scientific method underlying toolmark comparison evidence. To support this proposition, the majority cites two treatises to support the premise that “[t]he application of experimental design principles ‘differ[s] widely from field to field.’ ” Supra ¶ 24, quoting Science Primer, supra, at 1629.
¶55 But this unassailable premise casts doubt on Dr. Haber’s qualifications only if he rendered his opinions in ignorance of it. In fact, the record before us demonstrates that Haber exerted himself over a period of several years to become comprehensively conversant with the “literature,” “methodology,” and “studies” in the specific field of forensic toolmark comparisons before offering his expertise about the scientific design of that field. The record also demonstrates that Haber has spent decades in academia teaching experimental design at several of our nation’s most prominent universities. We can therefore infer that he understands the most basic premises of his own field, is conversant with the “classic text[s]” in experimental design, supra ¶24, and applied the lessons from them here.[12] Furthermore, the record shows that Haber has been trusted by numerous academic journals to conduct peer review, from the standpoint of scientific design, in a variety of scientific fields. This, at minimum, demonstrates that these journals believe Dr. Haber has broadly applicable expertise.
¶ 56 Finally, our record contains no suggestion that Dr. Haber misidentified any scientific principles at play in the toolmark field or even that the trial court considered this a factor in precluding his testimony. In short, the majority’s claim here — that Haber’s testimony could be precluded properly on the ground he lacked sufficient sophistication in scientific design to apply that wisdom specifically to the toolmark field — finds no foothold in the record before us.
¶ 57 I fear the majority not only misehar-aeterizes Dr. Haber’s qualifications in assessing his expertise to testify; it also implicitly applies a standard at odds with our state’s rules of evidence in so doing. As discussed *466 above, experts are deemed qualified if they possess wisdom greater than that of the jury as to the specific topic of their testimony. Although superior wisdom may be gained in a variety of ways, including by experience and training, see Ariz. R. Evid. 702, our supreme court has clarified that mere careful study is an equally appropriate method of securing expert qualification. See Macum-ber, 112 Ariz. at 570, 544 P.2d at 1085 (superior knowledge necessary to assist the jury may be based on nothing more than “careful study”); see also Ariz. R. Evid. 702 (itemizing “education” as a basis for expert qualification).
¶ 58 By that correct standard, the record before us is incontrovertible: as to Dr. Haber’s topic — the experimental design features of toolmark evidence — Haber has superior knowledge to the jury. He is a nationally trusted expert in experimental design generally and has applied that wisdom to toolmark evidence specifically only after “careful study” of the toolmark comparison field.[13]
¶ 59 Rather than assessing Dr. Haber’s expertise by evaluating whether he has expertise superior to the jury, the approach required by our rules and jurisprudence, the majority compares Haber to the mythological perfect witness: the expert in experimental design who has also become expert in the experiential practice of executing a toolmark comparison. Accordingly, my colleagues find fault with Haber’s qualifications because, inter alia, he has never been trained as a metallurgist and has never conducted a tool-mark comparison himself. Supra ¶ 25.[14] While these may indeed be qualifications that would make Haber a more perfect expert on his topic, and although our supreme court could hypothetically erect a rule for expert testimony requiring such elevated standards for its admission, my colleagues’ approach is simply not the one set forth in our pertinent rules and jurisprudence. The majority supports its approach primarily with reference to one case from a lone federal circuit, United States v. Paul, 175 F.3d 906 (11th Cir. 1999).[15] There, in finding the expert unqualified, the court emphasized the witness’s lack of practical training in conducting handwriting analysis and that his only claim to expertise derived from having reviewed the literature in the field. Id. at 912. By contrast, our supreme court has held that an expert may indeed be qualified by “careful study” alone, Macumber, 112 Ariz. at 570, 544 P.2d at 1085, and it has promulgated Rule 702 which, by its terms, makes no distinctions about the types of expertise necessary to demonstrate superior and helpful knowledge to the jury.
¶ 60 Moreover, the Eleventh Circuit supported its rejection of study as a basis for expertise by observing that the witness’s education as a law professor “did not make him any more qualified to testify as an expert ... *467 than a lay person who read the same articles.” Paul, 175 F.3d at 912. That conclusion implies that we must measure an expert’s qualifications against a hypothetical lay person who has reviewed the same literature. Such a standard, which is offered without any authority, finds no support in either the language or logic of Rule 702. Rule 702 requires an expert to possess only such “knowledge, skill, experience, training, or education” to “help the trier of fact to understand the evidence.” Ariz. R. Evid. 702; see Archuleta, 737 F.3d at 1297; Chapple, 135 Ariz. at 292-93, 660 P.2d at 1219-20. And, the Paul reasoning overlooks that the trier of fact in a criminal case is almost always a jury-a group of laypersons who have most assuredly not reviewed all the literature in a pertinent specialized field.[16]
¶ 61 Finally, the miserly approach to assessing expert qualifications applied in Paul has not been adopted by other federal circuits. The Third Circuit, in United States v. Velasquez, reversed the trial court for precluding the very same handwriting analysis expert whose qualifications were deemed insufficient in Paul. 64 F.3d at 848. In a dramatically different approach to that set forth by the Eleventh Circuit, the Third Circuit acknowledged that the proffered defense expert had gained specialized knowledge through years of study and academic work, id. at 847 n. 4, and, despite the fact that he was not a qualified practitioner of the forensic science at issue, id. at 848 n. 6, his general testimony critical of the field was nonetheless admissible because it “called into doubt the reliability and credibility” of the expert testimony offered by the prosecution and would have allowed the jury “to properly weigh th[at] testimony.” Id. at 848.
¶ 62 In so concluding, the court emphasized both “the ‘strong and undeniable preference [in Rule 702, Fed.R.Evid.,] for admitting any evidence having some potential for assisting the trier of fact’ ” and the relaxed standard for possessing adequate expertise to so testify. Velasquez, 64 F.3d at 849, quoting DeLuca v. Merrell Dow Pharm., Inc., 911 F.2d 941, 956 (3d Cir.1990). As the court observed, “ ‘[w]e have held that a broad range of knowledge, skills, and training qualify an expert as such,’ and have ‘eschewed imposing overly rigorous requirements of expertise.’ ” Id., quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir.1994). Indeed, this is the approach endorsed by the United States Supreme Court in Daubert. See 509 U.S. at 588-89, 113 S.Ct. 2786 (emphasizing “permissive backdrop” and “ ‘liberal thrust’ of the Federal Rules and their ‘general approach of relaxing the traditional barriers to opinion testimony’ ”), quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).
¶ 63 As discussed above, these standards parallel those set forth in our own version of Rule 702 and our state’s jurisprudence. In conformity with this liberal approach to admitting expert testimony, our supreme court has cited Velasquez with approval for the proposition that a trial court’s gatekeeping function under Rule 702 must not usurp the jury’s exclusive role in deciding the weight and credibility of testimony. Lehr, 201 Ariz. 509, ¶ 27, 38 P.3d at 1180. And, although the majority is correct that we owe trial courts considerable deference in assessing whether a proffered expert is sufficiently qualified to testify, our supreme court has not hesitated to reverse trial courts when, as here, the exercise of that gatekeeping function usurps the jury’s role in determining the appropriate weight to give an expert’s opinion. See id.
¶ 64 In short, the reasoning set forth in Paul is at odds with the approach to analyzing expert qualifications adopted by Rule 702 of the Arizona Rules of Evidence and our controlling jurisprudence. Paul’s holding is squarely contradicted by another federal case, Velasquez, which has been cited with approval by our own supreme court. I therefore cannot agree that we should anchor our reasoning in Paul, and I fear that, in so doing, we threaten Arizona’s long held preference for trusting juries to assess the corn- *468 parative credibility of those experts who may provide them helpful testimony.
¶ 65 Finally, at the core of the trial court’s decision to preclude Dr. Haber’s testimony was a fundamental misunderstanding of the appropriate purpose of expert testimony. The court precluded Haber’s trial testimony on the grounds that the court already had found the methodology and conclusions of the state’s expert sufficiently reliable during the Daubert hearing, and that the defense was not thereafter allowed to further “challenge an evidentiary ruling that’s already been made by the Court.” The court further reasoned, “I don’t think that the new rule ... adopting Daubert was anticipating that once the Court applied the rule that an expert would come in and challenge the Court’s findings.”
¶ 66 In the closely analogous context of a Frye hearing, our supreme court has rejected this very reasoning. Lehr, 201 Ariz. 509, ¶¶ 23-30, 38 P.3d at 1179-81. There, the defendant sought to challenge at trial the reliability of the protocol used by the state’s laboratory for DNA testing. Id. ¶¶ 20-23. The trial court precluded that testimony on the primary ground that the laboratory’s pi’otocol “was not within the jury’s province” and that allowing the defense to re-litigate the scientific reliability of that protocol before the jury would provide an improper “second bite at the apple.” Id. ¶¶ 23, 25.
¶ 67 Our supreme court reversed and observed that the trial court’s reasoning “fails to recognize that very often the same proof used to establish admissibility also impacts weight and credibility.” Id. ¶ 25. It then articulated the analytical distinction between the respective roles of the trial court and jury as follows:
A Frye determination is a preliminary finding regarding the admissibility of scientific evidence and expert qualifications. It is the judge who is called upon to make this determination. Ariz. R. Evid. 104(a). Yet, according to Rule 104(e), the judge’s role in determining preliminary questions “does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.” Ariz. R. Evid. 104(e). Implicit in this rule is an awareness that some evidence presented at the preliminary hearing will also be relevant to credibility and weight. Otherwise, Rule 104(e) would be superfluous.
Lehr, 201 Ariz. 509, ¶ 26, 38 P.3d at 1180.[17] It concluded that the trial court’s preclusion of the evidence presented at the Frye hearing “infringed upon the role of the jury and improperly insulated the state’s evidence from critique.” Lehr, 201 Ariz. 509, ¶ 29, 38 P.3d at 1180.
¶ 68 Although the supreme court has adopted new rules for the pretrial determination of the admissibility of expert testimony since Lehr, see Salazar-Mercado, 234 Ariz. 590, ¶ 1, 325 P.3d at 997, those rules similarly recognize that the threshold Daubert screening is not intended to diminish the jury’s role in assessing the reliability of expert testimony. As the Comment to the 2012 Amendment to Rule 702 observes:
The amendment is not intended to supplant traditional jury determinations of credibility and the weight to be afforded otherwise admissible testimony____ Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.
When the trial court precluded Dr. Haber’s testimony challenging the reliability of the state’s evidence on the ground that the court had already resolved that question during the Daubert hearing, the court overlooked that Haber’s testimony went to the weight and credibility of the state’s expert testimony and that its preclusion improperly insulated the state’s expert from critique.[18] The ma *469 jority mentions this erroneous component of the trial court’s ruling without further comment but overlooks that it likely influenced the trial court’s skepticism about Haber’s qualifications.
¶ 69 In my view, for all the reasons set forth in this concurring opinion, the trial court erred in precluding the proffered testimony of Dr. Haber. Notwithstanding the relevance of that testimony to significant evidence against Romero, I would also conclude the trial court’s error was harmless beyond a reasonable doubt. Haber’s testimony was brought exclusively to challenge the weight the jury could place on Powell’s opinion that only Romero’s gun could have fired the fatal shots. But there was other circumstantial evidence connecting Romero to the scene of the crime. Romero was both connected to a cell phone found at the scene and a truck observed leaving it. Given that the gun in question was found with the very person otherwise connected to the crime by two other items of evidence, the results of Powell’s testing rendered the proposition that another gun had fired the bullets unlikely in the extreme. Put another way, it would be an extraordinary coincidence if a weapon creating such similar markings as the murder weapon, but not involved in the murder, would happen to be found with Romero. Haber’s testimony — that Powell’s methodology could not scientifically exclude every other handgun in circulation as having fired the weapon — would not have altered that stark fact. I therefore concur in the result affirming Romero’s conviction and sentence.

. This conclusion is supported by a recent study of several forensic sciences conducted on behalf of the National Academy of Sciences. Nat'l Research Council of the Nat’l Academies, Strengthening Forensic Science in the United States: A Path Forward 154 (2009) (hereinafter "NAS Report”); see also Jennifer L. Mnookin, The Courts, the NAS, & the Future of Forensic Science, Brook. L.Rev. 1209, 1209-10 (2010) (observing that, "[flor many long-used types of forensic science, including fingerprint identification, firearms identification, handwriting identification, and toolmark identification, experts’ claims about their field, the authority of their methodologies, and their own abilities have dramatically outstripped what has actually been established by persuasive research and careful study”).

. Nor would such a rule be practical. Those experts who are skeptical of the scientific status of a practice would not likely become trained practitioners of its methodology. An astronomer need not be a practitioner of astrology to provide expertise on whether the latter field is anchored *464 in scientific principles. And to require as much would risk insulating expert opinions from cross-disciplinary critique.

. To counter this point, the majority selectively quotes Haber’s testimony that he had "no idea what an examiner does when he carries out an examination.” The true meaning of this quotation is provided by the sentence immediately preceding it, wherein Haber stated, "I can’t talk about the error rate for a method, because there is no method that's described.” In the context of his complete testimony, Haber was bluntly emphasizing that an examiner’s methodology— namely, ”put[ting] the cartridge and the bullet in a comparison microscope and looking] at them and mak[ing] a judgment then of whether they are from the same gun or not” — did not amount to a scientific methodology and could not be tested as such, because "[e]very examiner must be doing something slightly different” and "[h]is conclusions are clearly personal or subjective.” Haber was not suggesting he was unfamiliar with the methodology and protocol for conducting a toolmark test, as he made abundantly clear throughout his testimony.

. The trial court’s order demonstrates that she erroneously considered any trial dispute about the scientific reliability of toolmark comparison evidence to be foreclosed by her Daubert ruling. See infra ¶¶ 65-68. Given that Haber’s testimony exclusively addressed this very topic, her simultaneous finding — that he lacked adequate qualifications to critique Powell’s testimony— might merely reflect a narrower, and more accurate, conclusion that he was unqualified to address Powell’s execution of the test. But the effect of such a determination would be to set appropriate boundaries for Haber’s testimony rather than to preclude it altogether.

. Neither of the treatises articulating the foundations of scientific design is found in the record before us. The hazard of citing such materials for the first time on appeal, in support of a trial court’s finding of fact, becomes apparent here. In essence, the majority finds fault with Haber’s qualifications by suggesting that his conclusions run afoul of the teachings of academic materials: materials that Haber never was presented an opportunity to address during trial court proceedings.

. Indeed, unless some toolmark comparison practitioner exists who has become an expert in the field of experimental design, it is difficult to conjure an expert more qualified on the topic of Dr. Haber’s proffered testimony than Haber himself.

. The majority also chides Romero for not offering "a curriculum vitae, bibliography of published articles, or other record of Haber’s experiences and training,” supra V 22, and thereby suggests we are presented with an inadequate record of his qualifications. But Romero elicited exhaustive testimony from Haber under oath demonstrating his pertinent expertise in both experimental design and toolmark analysis. Such testimony constitutes a "record.” Moreover, Rule 702 requires no special format for the presentation of an expert’s qualifications.

. The majority also cites Myers v. Cessna Aircraft Corp., 275 Or. 501, 553 P.2d 355 (1976), to support precluding Haber’s testimony. But there, the Oregon Supreme Court did not affirm the wholesale preclusion of the trial testimony of the expert in question. See id. at 369. Rather, the court merely barred that expert from opining on one topic outside his expertise. See id. The witness, an expert trained in mechanical engineering with some limited experience investigating aircraft accidents, was allowed to testify generally about mechanical and engineering matters relevant to the airplane crash, but he was not permitted to render an opinion on its ultimate cause. Id. at 369-70, 553 P.2d 355. Here, Haber was never proffered to render an ultimate opinion about the execution of the toolmark comparison conducted in the instant case. For this reason, Myers provides no authority for excluding Haber’s general testimony about the scientific design underlying toolmark evidence. Rather, Myers suggests such general testimony would be admissible, just as the expert there was allowed to testify to matters within his general expertise. See id.

. Moreover, my colleagues’ reasoning in finding Paul controlling fails to consider that a nationally recognized expert in the field of experimental design such as Dr. Haber would read toolmark literature with a considerably more sophisticated eye than a layperson and therefore be far better equipped to assist the jury in understanding it.

. Although Lehr quoted the prior version of Rule 104, its material provisions remain the same. See Ariz. R. Evid. 104 cmt. (noting changes intended to be stylistic only).

. This problem becomes especially pronounced when, as here, an experience-based expert makes scientific claims. As noted, the state’s expert made scientific claims about the reliability of his conclusions. And he specifically disputed on cross-examination that no statistical probabilities existed concerning erroneous matches, asserting that there had been "several papers written” on *469 the topic and that each of them had found the chance of another gun making the same identifiable markings to be "astronomical.” This claim would have been forcefully rebutted by Haber’s proposed testimony. Accord NAS Report, supra, at 153-54 (”[T]he decision of the toolmark examiner remains a subjective decision based on unar-ticulated standards and no statistical foundation for estimation of error rates.’’). In fact, the state capitalized on the absence of Haber in this skirmish, observing in summation that Romero had presented “no evidence from this courtroom, from that witness stand that actually challenges firearm analysis.”